Good morning, Your Honors. My name is Glenn Cantor. I represent the plaintiff, Jesslyn Dine. Your Honors, the key defendant in this case is Metropolitan Life Insurance Company. And they, of course, are an insurance company. But they don't want you to consider them, in this case, an insurance company. They want to be considered an ERISA fiduciary. And they want the benefits of being an ERISA fiduciary with a discretionary standard of review. They want an abusive discretion standard. And the Supreme Court has addressed that. And they've said, if you're an ERISA fiduciary, you have a higher-than-marketplace standard in your conduct, particularly with giving a claimant a full and fair review. It's our position that this case centers on the fact that the claimant was not given a full and fair review by Metropolitan Life. For a number of reasons. In terminating the claimant's benefits, and let's remember this claimant had a high school diploma only and spent her entire adult life working as an airplane mechanic. When she's trying to complete her claim or continue her claim, she's on Vicodin and is in chronic pain. MetLife denies the claim or terminates on two key bases. The first is they say she's not receiving regular care. First of all, MetLife receives an APS from her doctor six weeks before they terminate, saying he's just treated her. What's APS, by the way? I'm sorry, attending physician statement. Okay. I'd point out the plan at issue doesn't even define what regular care is. But she's getting it because six weeks before they deny, she's received treatment from her doctor. Well, the treatment consisted of her filling out some forms and getting a prescription. And seeing her doctor in order to do that. That's correct. But she also, at the time of the termination, has a phone call with them and says, by the way, I've just had a crushed foot. I'm seeing new doctors. I'm seeing a new chiropractor and I'm waiting for an orthopedic referral. So with regard to regular care, it's hard to say she's not receiving regular care. Particularly when that term isn't even defined. I thought that was in her appeal. The material about the new doctors and the crushed foot and all that. That's correct. That is part of her appeal. You said it wasn't a phone call before the first decision. No, Your Honor. If I said that, I misspoke. The sequence is they deny her claim on March 29th. On April 9th, she has a phone call with them where she tells them this information. She follows it up with her appeal letter. It seemed to me that, in a way, the two of you are passing in the night because you're really mainly complaining about the appeal. Correct. But I am mainly complaining about it. But I would point out that there are procedural errors even before the denial. For example, they say we don't have enough evidence to support her claim. They send it off to their retained reviewing physician, Dr. Thomas. He says, first, after lengthy discussions, he doesn't say with who. We assume it's with people at MetLife who he's employed by. They decide not to call Dr. Davis. That wouldn't be productive. He instead says we should have an independent medical exam. We should send her out to have her examined by a doctor. The MetLife people first say yes and advise my client that's what they're going to do. Then they decide no, we're not going to do that because there's not enough evidence in the record for the doctor to determine if she's disabled currently. Well, I think that's the point of an independent medical exam, that the doctor examines her and determines it. Also, with regard to the records reviewing doctor, he says I don't have anything that's more than a year old, or less than a year old, excuse me. The day after they send records to him, they receive in this new attending physician statement from Dr. Davis. They don't even bother to give it to their records reviewer. They go ahead and deny the claim. Shortly after they deny the claim, there's an entry in the record that should we have what's called a transitional skills analysis? You do that as a precursor to a vocational report to determine is there really a job this woman who is on Vicodin, who is in chronic pain, who has a high school diploma only, who's almost 50 years old, can't sit, can't stand for the length of time, is there a job she can do? They decide no, we don't need to do that vocational exam. Those are all problems before the denial. But then, as the court mentions, there is a problem from our perspective with the appeal. There is an April 9th phone call. It's recorded unilaterally, unless they're recorded. There are notes taken by a MetLife representative. And the representative says we spoke to her, she understood she had to send in records. Well, maybe she did, maybe she didn't. We don't really know what was said. We just know it MetLife recorded or wrote down. But then on May 29th, she sends in her appeal letter. And she sends in a list of four doctors' names and says, here are my treating doctors. You said I don't have regular care. Here they are. MetLife previously says, well, we understood that she understood to send in records. But clearly, she doesn't understand that. Now, Judge Kaczynski, in several opinions, Booten and Saffron, has discussed this. What he said is, if the plan administrator believed that more information is needed to make a reasonable decision, they must ask for it. There is nothing extraordinary about this. It's how civilized people communicate with each other regarding important matters. So MetLife, at this point, they have this letter of May 29th appealing the denial, determination of benefits. My question. As we understand an appeal, that wouldn't be an appeal because the ‑‑ I mean, as we understand it in the courts, because you'd be looking at the record that was available before the initial decision was made. But that's not true with regard to these risk claims? In other words, she's now raising a whole new thing she never raised before. New doctors, new injury, everything. Can she do that on an appeal? I think maybe she can, but that's what I want to know and what are the regulations that govern that and so on. Oh, absolutely. She can provide any information that she needs. Including new information that didn't even exist before. Well, absolutely, yes. She's giving them new information about the new doctors she's seen. She's telling them ‑‑ she's told them she's seen a new chiropractor because of logistics geography. Yes, she can provide any new information that she believes is relevant to her claim, and she does. So what's ‑‑ it would be helpful for me to know what the authority for that is. It is a little ‑‑ I mean, it's not the way we usually think of what's an appeal. Well, Your Honor, I can't cite the authority off the top of my head. It's the original regulations that allow a claimant to submit additional information on ‑‑ it's not really an appeal. It's a request for reconsideration. I can submit a letter of reconsideration. Additional information is about a different time period. No, it's about this time period. Well, it's a current time period, but that's necessarily a time period before the decision was made. Well, I would disagree that it is about the time period before the decision is made. Contemporaneous. She's saying to them, these are the doctors I'm seeing right now. Yes, once you file the appeal. Yes, but in an ERISA appeal, request for reconsideration, is the time to ask for a request for reconsideration, give in more information. They said, you have not given us enough. This is her opportunity, and she does what she thinks she's supposed to do. She gives them their names. Now, what MetLife could have done, they could have done a lot of things. First, they had an authorization they had asked her for back in November to get doctors' information. They say to her in the letter, they send to her, here's an authorization we need you to sign so we can communicate with your doctors. She signs it and sends it back. So, on May 29th, they have things they can do. They can use the authorization to contact these doctors. They can go ahead with the IME, the independent medical exam. They can do the transitional skills analysis to see is there a job she can do. They do none of these things. They know at this point that she doesn't understand what she, what they wanted her to do. But they don't tell her. In fact, this is, I think, the key of the whole case, is what they do is worse than nothing. If the court could look at ER 57, it's a letter of June 12th. After she submits her request for reconsideration, what you would call her appeal letter, they write to her. Two sentences. This is a thrust to the case. We are presently reviewing your claim. If it is determined that additional information is needed to complete our review, we will notify you accordingly. Now, what does any reasonable person think when they get that letter? They think, I've done what I needed to do. They will tell me if I need more. What they were really saying to her was, thank you, Ms. Dine. You've given us nothing, and that's enough for us to deny your appeal. And that's what they did. Because after her appeal, after they said to her, you've done all you need to do. We'll tell you if you need to do more. They do nothing. They get no records. They make no phone calls. They don't call her up and say, no, Ms. Dine, that isn't enough. You need to go get the records. They don't use the authorization themselves. They do nothing. But they deny the appeal, saying, we didn't get any new information. Well, first, they did get new information. They got the information from her that she had a broken foot, a crushed foot. She was on crutches. That she had new doctors. So they did have new information. But more important, in their appeal letter, they say, we didn't get anything new. But they had told her, we have everything we need. The simple question is, is telling somebody, we have everything we need, is that the conduct of an insurance company that is self-motivated, that is financially motivated, that is biased, or is that the conduct of a fiduciary acting with higher than marketplace standards? Is that a full and fair review? If those doctors' records that she referenced, for those four doctors,  she was still taking Vicodin if she was in chronic pain. She had back-to-back problems. There was nothing she could do. She couldn't sit. She couldn't stand. As Dr. Davis had told them, as recently as February 13, 2001, the whole story could be different. But they do nothing. They tell her, we have all we need. Their view of the most recent Dr. Davis statement is that it was not based on any new examination. It was simply a rehab statement of his earlier. That is their view. But he says in his report, most recent exam, February 13. But it doesn't say he examined her. He didn't say he did anything. That's what they say. His APS says he did examine her. The attending physician's statement says he did. But at that point, once again, they didn't call him to say what happened. They didn't send out another request for records. They just said, we assume he didn't do anything. And once again, they discussed, well, based on this, we should send her out for an independent medical exam. Well, okay, fine. Why don't they do that? In Saloma v. Honda, this court very recently said, that's evidence of arbitrary and capricious conduct. Because the insurance company knows if they do that, they might find evidence that somebody's disabled. Why would they not do that? We know why an insurance company would not do that. But why would a fiduciary with higher than marketplace standards not do that? I believe that in this case, she did not receive a full and fair review. When they tell her, we've got everything we need, they're basically lying to her. This court in Pannebecker said, in that situation where somebody's been denied a full and fair review, there's an appropriate remedy. The remedy is, you bring this person current and send it back for them to re-review. This woman has waited I do have one minute left if you want to save it for rebuttal. I will. One more quick point. This woman has waited 10 years. The denial is July 2001 for her benefits. She shouldn't have to wait any longer. Thank you. You may be dropped. Good morning, Your Honors. May it please the Court, Rebecca Hull for the appellees, the Boeing Plans and Metropolitan Life Insurance Company. I think we've sort of lost track of the forest amidst all these trees. The simple fact is that for a period of about 18 months, starting in early 2000, the plan made at least 15, by my count probably more, contacts with Ms. Dine or with her doctors saying, please give us records about your current medical condition. And she didn't. And neither did they. The doctors routinely ignored letters and telephone calls, except, of course, for the one call where the chiropractor said, well, no, actually, we haven't seen her for a year and a half, although she continued to list the chiropractor as a treating physician. But over and over and over, in very personalized contacts with her, including a lengthy discussion shortly after the termination letter, they kept explaining to her what needed to be done to support her claim. And, in fact, even in July of 2003, two years after the termination letter, when she called and she said, can I make a new claim, they said, well, no, you can't, because you didn't go back to work, so you didn't restart your coverage. But if you will just send us the records covering the period from 2001 on, you can do a further appeal. Well, they didn't exactly say that. But you're going to have to explain the delay, they said. I'm sorry, but you're going to have to explain the delay. Right. But they also said that she can reopen her appeal. They specifically said that. And she said … All of that's fine, except I don't understand your June 12th letter. In your appeal denial, it's based on you have not provided medical documentation. And you're telling us the history of that. But in the June 12th letter, you say we have everything we need. If we need more, we'll tell you. Now, I don't understand how you can say we don't have information in the decision, which keeps talking about the fact that she hasn't provided documentation. And then, but you've told her that you have everything you need. Well, actually, the words, this may be equivalent, but I am a lawyer. The words everything we need do not appear in that letter. That's counsel's interpretation. Well, if it is determined that additional information is needed. Right.  I don't think that that is actually a fair interpretation in this situation, Your Honor, because this letter has to be read in conjunction with the detailed and lengthy discussion they had with her on April 9th. But that brings up my question about whether she wrote a letter. She's now raising new information. That new information has never been looked into at all, as I understand it. Is there anything wrong with her doing that? She now has new doctors and a new injury. It's not wrong per se, except that the plan is very specific about what she has to do to support an appeal. Her problem, which is? It's at ER 328, and it says specifically, if you're going to appeal, you have to provide certain things like your Social Security number and things like that. And then it says, quote, the reasons for your appeal and any additional documents or records that may support your request. And that follows the word, you must provide. So this is not optional. This is her burden. And then she appeals and doesn't do that. No, she did not do that. No. And you tell her, if we need additional information, we'll notify you. Well, I think two things, Your Honor. One is she could have submitted it sometime in the interim. It could have been coming from doctors or whatever. I know she could have. But you told her, we've got your appeal. We have all the information we need. Well, no. They didn't say that. I think you're- We can go through that again. When you say, if it is determined that additional information is needed to complete our review, we will notify you. Yes. Now, that's not the same as saying, we have all the information we need. No. They were not putting a- Well, the difference, I think, Your Honor, is this has to be read as part of a course of communication specifically about the appeal, which includes the discussion on April 9th, where they go through with her the fact that they need these records. What you're essentially saying is that the reason they didn't need any more information to deny the appeal is because they were denying it on procedural grounds because she didn't herself include the information. In other words, it's a circle. That's really what you're saying. You're saying, I mean, it's the only thing you can be saying. Because what you're really saying is they have no obligation to ask her for any more information because she was supposed to provide it. Therefore, they didn't need any more because they could deny it without it. I think that they reconsidered, as you would expect them to do, what they already had in their file. She had the right to submit- I understand that. But that's why I'm saying that, to me, the case turns on the appeal. Because before that, they asked for a lot of stuff. I mean, it was a little strange that they first decided that they sent it off to a reviewing doctor who said to have an independent examination, and they didn't. But putting that aside for the moment, mostly the issue, it seems to me, centers on the appeal. So with regard to the appeal, it doesn't look a whole lot different from what happened with regard to before that, except now she has new doctors and a new complaint. Earlier, when she did that, they had gotten in touch with the doctors themselves or told her that she had to do it, and they had had a dialogue with her. Now, at the appeal level, with the new doctors and the new complaints, they say nothing. Well, one of those four doctors is the same one that she's had all along, but refusing to respond. That was Dr. Davis. Okay. A second one, she says, was treating her for the foot injury that she says she had in January. Although, curiously, she had never mentioned him, despite multiple telephone calls and communications with MetLife during that six-month period. I mean, that's where these comments of Judge Kaczynski's become interesting, because if you want to know, you ask her. All right. Why is it that you never mentioned this guy, and now all of a sudden there's a new doctor? I suppose they could have, but I think it just has to circle back around to what the plan said was her obligation to support her plan. Right. So, therefore, what I said is true. It's basically a procedural denial. That, I believe, is true, but it's an important procedural point, because all participants of this plan have to support their claims. That was the kind of plan their employer chose. That's what the plan requires. That's what the law requires, for that matter. And if we change the rules for her, then we have to change the rules for everyone, and then the plan means nothing, basically, if it's not going to be enforced the way it's written. MetLife is, in fact, a fiduciary of the plan, but it has a black-letter law requirement as a fiduciary to enforce the terms of the plan. I don't think you have to change the law or any of that. I suggest next time you don't include that sentence that says you have all the information you need. Well, I can't answer that, Your Honor. That was 11 years ago. Well, let's hope it can change. But I do think that if we're going to talk about these points, we have to talk about – now, counsel was saying, well, you know, it's been 11 years. Well, yes, it has been 11 years, but I think that the remedy that counsel is seeking would be grossly inequitable in this situation, particularly since two years after that, eight years ago, she was given the ability to simply submit the records that she had refused to provide before and go on with addressing the substance of this eight years ago in July of 2003, and she point-blank refused to do that. I think in the circumstances, it is a perfectly logical and, in the words of Saloma, reasonable conclusion to come to the decision that the reason she's not submitting anything is there isn't anything to submit. I think that's the real answer, and I think a reasonable fiduciary would come to that conclusion because otherwise, why would this woman not have – if she wanted to submit a new claim, which she said she did, why was she flat refusing to simply provide the records that they had requested all along and go on with the claim that she had? This 2003 notation says, did she RTW? What's RTW? Return to work. I think that what Ms. Dine is seeking in this case is a reward for refusing to comply with the terms of the plan and refusing to comply with the invitation that she got in 2003 to go ahead and support her claim with something showing that, A, she was disabled within the meaning of the plan as of March of 2001 when the claim was terminated, and, B, she was under the regular care of a physician. Scalia, when you say return to work, with the same company? Yes, that was what they were asking because she was asking if she could make a new claim under this plan. And in order to do that, she would have had to go back to work and restart her benefits, so to speak. And did she go back to work? No, she did not. Okay. So far as anything in the record shows, and I believe that to be the case. Now, it has been suggested by Ms. Dine's counsel that the concept of regular care of a physician is ambiguous. But I think it's interesting that one of the cases that they cite says specifically that it's not ambiguous. It's easily understood. Well, obviously, and I think the documents themselves say this. If there's nothing to be done for her, there's no point in her going to a doctor. And I think you're – something in the explanations here supports that. Is that not true? I mean, the plan requires you to be under regular care of a doctor. There's nothing a doctor can do? Well, there has to be proof of a disability requiring regular medical treatment. In essence, it's a reality check on someone saying, oh, I'm disabled. Well, if they never go to doctors – Somebody's paralyzed from the waist down. They're paralyzed from the waist down. Right, exactly. And that would be an example of one in which there wouldn't be anything that would be able to alleviate the condition. Right. And so regular care might consist of something different from what it would in another situation. It consists of nothing except living your life. Right. So it doesn't really mean regular care. So what doesn't mean that? But in this situation, if what she was saying is true, one would expect her to be receiving regular care. She says she's got this undefined – and her doctors never diagnosed or gave any diagnosis for it – undefined back pain. But there's no regular care in the sense of no one's got a treatment plan. No one is referring her to specialists. None of her – I mean, the only things that she ever sent in from a doctor just say she comes to the office with disability papers. She says she doesn't intend to ever go back to work. She wants us to fill these out, and she wants pain pills. That is not, I don't think, in a reasonable interpretation, regular care of a physician. One other thing about the record that seemed strange was that she asked for the name of the doctor who had reviewed her record. There was a doctor who had reviewed her record, and instead she got this kind of weird response about the person who wrote some article that was referred to. I – the only thing I can think on that, Your Honor, is that there was simply a misunderstanding. The termination letter referred to a Dr. Presley Reed and gave some information. It's clear – They had a book in the library. Right. It's clear that when the claim analyst got the question from her, they thought that's what she was talking about and that she had interpreted that as being a – I know she has. She said, who was the doctor who terminated me? Well, there was a doctor involved. Well, there was a doctor who had looked at her file, although what he had to say didn't really have anything to do with the termination. It was simply – Well, it had to do with the conclusion that it wasn't adequately supported. Well, I think they had already actually reached that conclusion. But I agree, Your Honor, that they seem to have been just passing one another here. And it could have been relevant information, because this doctor appears in other reported cases, actually. So it could have told her or her lawyer something about who they were dealing with. Well, on that score, I mean, I think it's noteworthy that she was told she could request her complete file, and they would have sent it to her, but she never did. And if she had, of course, she would have gotten the report. But I think it was simply a misunderstanding between them that they thought she was talking about the only doctor referenced in the termination letter, which was actually the author of a treatise, and that's what they were trying to explain to her. They didn't interpret it otherwise. I don't think there was certainly any attempt to keep something from her. All right. Thank you, counsel. I think Ms. Hull is correct when she talks about the forest and the trees. We have to look at the forest, and this is a policy argument. And we have a $750 billion insurance company against Ms. Dine, who is on Vicodin, who is in chronic pain, and they have a fiduciary duty. If there's a question here, was there a full and fair review, I think the tie goes to the runner. The answer is no. She did what she thought she needed to do, and they told her that's all she needed to do. What she did two years later, I don't know what she was thinking. At that point, maybe she just gave up. Can you explain the significance of a two years later event? I cannot. Other than at that point, maybe she just felt defeated and didn't know what to do. I have no answer to that. It's not in the record. Well, if they did tell her that she was going to have to explain why she was two years late, she might have said, well, I can't do that, so no point. I'm sorry. She might have said, I can't do that, so no point. That's exactly the point. Correct, Your Honor. And the plan that Ms. Hull keeps saying they have to enforce that plan says you get one appeal and it's closed. And I can tell you from personal experience that the answer to MetLife would have been, sorry, you're too late. You had one appeal. You got it. So, once again, this is a policy question. Can a fiduciary lead somebody down the garden path and slam the door behind them and say, well, we told you. You gave us everything you needed. Well, suppose that sentence wasn't in there, all right? Could they have said to her, you know, we told you on the phone to submit anything you needed, medical stuff. The plan says you're supposed to submit medical stuff. We've been telling you for a couple years you have to submit medical stuff. If you have new doctors and you didn't submit the medical stuff, you're out of here without asking any more questions. Would that be okay or not, leaving out the sentence? If they had, well, leaving it out and saying what you said before, telling her what to do, that she had to send it in? Yes, it would have been. Otherwise. But they did do that. They did tell her on the phone, you have to send in any new documentation. Well, we don't know that they told her that. They say they told her that, but her letters had been put in any declaration they didn't. She's been allowed to put a declaration that she didn't, Your Honor. The record's closed. We go with the record that's there. With regard to the question of their conflict, it isn't closed. No. We can submit conflict evidence, but there is no support for her to put in new evidence. Of saying something in a memo that isn't true, the conflict evidence? I've never seen any support for that, that she can put in. I don't think so. Do it next time. Next time we will. But in this case, going back to Judge Kaczynski, I mean, there's a failure to communicate. Civilized people talk. They were the ones that talked next, and what they said was a lie. They said, we have everything we need. They didn't do what Your Honor suggested, was to say, send us the records. They said, we have all we need. Is that the message that should be given to an arrested fiduciary, that you can mislead a claimant while claiming that you're not biased, that you're there to protect the claimant's interest as well as the plan's interest? That's just not the message I think should be sent. The message should be sent is, they're there to make sure the claim gets paid if it's proper. She sends in a list of doctors, and they ignore it. They do worse than ignore it. They tell her it's not. The letter they sent her says, with regard to a review, that you should submit any request to review pertinent documents. You may also submit additional medical or vocational information, any facts, data, questions, or comments you deem appropriate, and MetLife will evaluate all the information and advise you of your determination, which certainly suggests that you're supposed to get everything you wanted to have and not wait. And she did what she thought, first of all, to back up, she had given them an authorization to get records. They had suggested they can get records with an authorization. So she sends them the doctor's names. She is at best confused, and they add to her confusion. Once again, Your Honor, if they had done what you suggested and say, no, Ms. Dine, that's not enough. We are not going to go out and get these records, even though we've asked for and gotten authorization. You need to do it for us. Okay, fine. If that happens, maybe we're not here. Maybe she does it, or maybe she doesn't, and we say, sorry, that's not a case that we can take. But when they say to her, we have all we need. Did she send them authorizations for these four doctors? On November 1st, 2000, to back up, in October 2000, they sent her a letter saying, we need from you an authorization so we can communicate with your doctors. She stated it and sent it back. It's in the record. It was an authorization that was good for two years. So they had an authorization in their file that they could have contacted any doctor they wanted. But they say to her, we have all we need. So we have to believe that her expectation was, they're going to get those records. If they want me to get it, they'll tell me. I mean, that letter is key. If that letter is allowable, if that letter constitutes a full and fair review, then the answer is, it's buyer beware. And the buyer is the claimant. Beware of the fiduciary who's supposed to be protecting your interests. Thank you, Your Honor. The case gets argued, will be submitted.
judges: Panner, Reinhardt, Berzon